SUZANNE J. ROMAJAS (NY Attorney Reg. No. 2693943)
Email: RomajasS@sec.gov
CHRISTIAN D. H. SCHULTZ (DC Bar No. 485557)
Email: SchultzC@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-4473 (Romajas)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>v.<br><br>AXESSTEL, INC.,<br>PATRICK J. GRAY,<br>HAROLD CLARK HICKOCK III, and<br>STEVEN R. SABIN,<br><br>                    Defendants. | Case No.<br>**'18CV1486 L    AGS**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

### SUMMARY

1.      From at least the fourth quarter of 2012 through the first quarter of 2013, three executives, including the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") of Axesstel, Inc. ("Axesstel") – a Southern California company that sold mobile telecommunications devices and security systems to customers in Europe, the Middle East, and Africa – engaged in fraudulent accounting practices that materially

1

inflated Axesstel's revenue by $10.5 million (or 66%) in the fourth quarter of 2012 and $3.9 million (or 38%) in the first quarter of 2013.

2.     In many instances, material terms of purported sales to Axesstel's customers – including price, delivery, and payment terms – were not finalized before the end of the period in which Axesstel recognized the revenue, and unit sales prices were routinely inflated to enable Axesstel to hit revenue targets.  These sales terms were reflected in fake purchase orders prepared by company executives and internally referred to as "*holding POs.*"  Axesstel also entered into undisclosed side agreements with at least two customers, which relieved the customers of any obligation to pay for the products they purportedly purchased unless and until the customers were able to resell the products to their own end users.

3.     To conceal the fraud and justify the revenue being recognized, Axesstel executives presented these "holding POs" to Axesstel's auditor, even though the customers had not actually agreed to the terms reflected therein.  Axesstel executives also asked at least one customer to deceive Axesstel's auditor by falsely acknowledging an outstanding accounts receivable balance that Axesstel had secretly agreed the customer did not actually owe.  Further, Axesstel's CFO and CEO signed quarterly management representation letters to Axesstel's auditor that failed to disclose the true facts and circumstances of these purported sales.

4.      Ultimately, many of the improperly recorded sales were never finalized, and Axesstel's customers refused to accept the products they purportedly had ordered, or they accepted the products in lower quantities than was reflected in the "holding POs."

5.      When the Chairman of the Audit Committee of Axesstel's Board of Directors eventually requested information about these sales, Axesstel's executives concealed facts that would have exposed the fraud and provided false information to the Audit Committee, which was later shared with Axesstel's auditor.

6.      Axesstel, its CFO Patrick J. Gray ("Gray"), CEO Harold Clark Hickock III ("Hickock"), and Director of Contract Fulfillment and Sales Operations, Steven Sabin ("Sabin") (collectively, the "Defendants") participated in, orchestrated, or otherwise authorized the improper revenue recognition and deceit of Axesstel's auditors, and thereby violated and/or aided and abetted the antifraud, reporting, and books and records and internal controls provisions of the federal securities laws and should be enjoined from committing such violations in the future.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Sections 21(d)(l), 21(d)(3)(A), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(l), 78u(d)(3)(A), and 78aa].

8.      Venue is proper in this District under Exchange Act Section 27 [15 U.S.C. § 78aa].  A substantial part of the acts and transactions constituting the violations alleged

3

herein occurred in this District and, as set forth below, Axesstel is headquartered and Gray and Sabin reside within this District.

9.     In connection with the conduct alleged in this Complaint, Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## **DEFENDANTS**

10.     **Axesstel, Inc.** is a company based in San Diego, California, that develops, manufactures through third-party contractors, and sells wireless broadband, telecommunications, and security alert systems to the global markets.  Axesstel's common stock traded over-the-counter under ticker AXST and was registered with the SEC under Section 12(g) of the Exchange Act until October 6, 2017, when the SEC revoked its registration for failure to comply with reporting requirements.

11.     **Patrick J. Gray**, age 57, resides in San Diego, California.  Gray is and at all relevant times was Axesstel's CFO.  Since November 2013, Gray has also served as Axesstel's CEO, and has been a member of the Board of Directors since June 2011.

12.     **Harold Clark Hickock**, age 62, resides in Sapphire, North Carolina.  At all relevant times, Hickock was Axesstel's Chief Executive Officer.  Hickock retired from Axesstel in November 2013.

13.     S**teven R. Sabin**, age 42, resides in San Diego, California.  At all relevant times, Sabin was Axesstel's Director of Contract Fulfillment.  Since 2014, Sabin has served as a consultant to Axesstel.

**FACTS**

14.     As a public company, Axesstel was required to file quarterly and annual reports with the SEC that presented its financial results in conformity with Generally Accepted Accounting Principles (GAAP).

15.     GAAP requires that revenue must both be realized or realizable and earned before it can be recognized by a company.  *See* Financial Accounting Standards Board's Accounting Standards Codification ("ASC") 605-10-25-1 ("*Revenue and Gains*").  Revenue is deemed realizable when (i) there is persuasive evidence that an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the seller's price to the buyer is fixed and determinable; and (iv) collectability of the purchase price is reasonably assured.  *See id.*; *see also* ASC-605-10-S99.  Further, under Financial Accounting Standards No. 48, *Revenue Recognition When Right of Return Exists* ("FAS 48"), revenue shall not be recognized if the buyer's obligation to pay the seller is contingent on the resale of the product or if the seller has significant obligations to bring about the resale of the product by the buyer.

16.     At the direction and with the participation of Gray, Hickock, and Sabin, Axesstel fraudulently recognized revenue in the fourth quarter of 2012 and the first quarter of 2013.  As detailed below, revenue from numerous purported sales was recognized in both periods even though the criteria for revenue recognition under GAAP had not been met.  In each instance, Axesstel lacked persuasive evidence that a sales arrangement existed, the sales prices were neither fixed nor determinable, delivery never

took place or had not occurred during the reporting period, and/or collectability was uncertain and, in some instances, unlikely.

## Axesstel Reported Material Amounts of Improper Revenue in the Fourth Quarter of 2012

17.     On February 28, 2013, Axesstel filed with the SEC its annual report on Form 10-K for the period ended December 31, 2012 ("2012 Form 10-K"), which Gray and Hickock signed and certified was a truthful and accurate report of Axesstel's financial results and performance.  The 2012 Form 10-K reported fourth quarter 2012 revenue that improperly included more than $10.5 million in revenue – 66% of revenue that quarter – from purported sales to Company A, a South African telecommunications company, Company B, a Scandinavian telecommunications company, and Company C, a Nigerian telecommunications company.  GAAP precluded recognition of revenue from these transactions during the fourth quarter.

### Contingent Sales to Company A

18.     On or about December 21, 2012,  Axesstel customer Company A – a South African distribution company that sold to end-users in South Africa and elsewhere on the African continent – purportedly ordered 35,000 Axesstel AG50 alarm systems and 5,000 Axesstel SP100 mobile phones, with total projected revenue of $4.1 million for Axesstel from these sales.  The orders were initially reflected in two purchase orders that stated payment was due 30 days after Company A's acceptance of the product.  Simultaneously, Axesstel sales personnel entered into a side agreement with Company A, which made

Company A's payment obligation contingent on its receipt of "requirements from the end customer" and allowed Company A to cancel the order if end-user purchase agreements did not materialize.  Axesstel sales personnel also agreed "at no cost to [Company A to] facilitate shipments to be held in China until the actual [purchase orders] and terms between [the end customers] and [Company A] are completed."

19.     Sabin discussed the actual terms of the Company A transaction with Gray, who was subsequently included on email communications with Axesstel sales personnel about the need to obtain revised purchase orders from Company A *after* the end of the fourth quarter.

20.     In January 2013, at Gray's request, Sabin instructed Axesstel's sales personnel to obtain revised purchase orders from Company A to eliminate the payment contingency from the face of the purchase order, and to increase the price of each unit by $10.  Internally, Axesstel's executives justified the price increase as a payment for Axesstel's marketing services, but Axesstel had no agreement with Company A to provide marketing and development services for its products and no expectation that Company A would actually pay the additional $10 per unit.

21.     In contemporaneous email communications, Sabin acknowledged that a side agreement making Company A's payment obligation contingent on resale to its own customers could pose a concern from an audit standpoint and hoped to create a "clean paper trail" for Axesstel's auditor.

22.     At Gray's direction, Sabin instructed Axesstel's sales personnel to obtain the revised purchase orders from Company A by January 20, when Axesstel's auditors were expected to review the sales documentation.  Axesstel's sales personnel complied with the instruction.  The revised purchase orders were backdated to December 2012.  The revised purchase orders concealed from Axesstel's auditors the fact that Axesstel had given a consignment agreement to Company A.  The price increase in the revised purchase orders increased Axesstel's reported revenues for the quarter.

23.     Axesstel, through the efforts of Gray, Hickock, and Sabin, improperly recognized $4.1 million from these purported fourth quarter sales to Company A and included this revenue in the financial results that it reported in its 2012 Form 10-K.

24.     Because the price was not fixed or determinable by quarter-end, and Company A's obligation to make payment was contingent on its ability to resell Axesstel's product to its own customers (and therefore collectability was not reasonably assured), revenue from the purported sales to Company A was neither realized nor realizable, nor earned, as required by GAAP and should not have been recognized in the fourth quarter of 2012.

25.     As it turned out, Company A did not sell the units to its end user customers and, consistent with the side agreement, Company A did not pay Axesstel anything for the units.  In November 2013, Axesstel recorded all $4.1 million of Customer A's purported purchase as returned to inventory.

**Contingent Sales to Company B**

26.    On or about December 11, 2012, Axesstel customer Company B – a telecommunications distributor that was one of Axesstel's oldest and largest customers – purportedly ordered 25,000 units of Axesstel CDMA 450 Routers for its operations in Norway, and 15,000 units of the same product for its operations in Sweden, with total projected revenue for Axesstel from these sales of $5 million.  Axesstel, through its sales personnel, simultaneously entered into a separate side agreement with Company B that altered the terms reflected in Company B's purchase orders and secretly allowed Company B to pay only "when necessary to match market consumption."  At the time, Axesstel's sales personnel further confirmed that Company B "will have no obligation to make payments [for the 40,000 units] until the devices are actually required."

27.    Gray learned of Company B's side agreement with Axesstel prior to signing and certifying Axesstel's 2012 Form 10-K on February 28, 2013, and he orchestrated an effort to conceal the side agreement from Axesstel's auditor when Company B mistakenly informed the auditor during the audit confirmation process that its payment obligations were contingent on downstream sales.

28.    In February 2013, before the 2012 Form 10-K was filed, Axesstel's auditor contacted Company B to confirm the validity of an outstanding accounts receivable balance Axesstel had reported, which purportedly stemmed from its fourth-quarter 2012 sales to Company B.  Company B informed the auditor that its payment to Axesstel was

contingent on shipment of the product, which was consistent with the side agreement but not the terms of the purchase orders.

29.     When Gray and Sabin learned of Company B's communication with Axesstel's auditor, they asked Company B's management to follow up with Axesstel's auditor and to falsely acknowledge Company B's financial responsibility for the full amount while concealing the existence of the parties' side agreement.  Axesstel sales personnel secretly confirmed to Company B, in an email on which Gray was copied, that Axesstel "will eventually adjust pay terms so they align with natural consumption."

30.     Axesstel, through the efforts of Gray, Hickock, and Sabin, improperly recognized $5 million from this purported fourth quarter sale to Company B and included this revenue in the financial results that it reported in its 2012 Form 10-K.

31.     Because price was not fixed or determinable by quarter-end, and Company B's obligation to make payment was contingent on its ability to resell Axesstel's product to its own customers (and therefore collectability was not reasonably assured), revenue from the purported sales to Company B was neither realized nor realizable, nor earned, as required by GAAP and should not have been recognized in fourth quarter 2012.

32.     As it turned out, Company B did not pay Axesstel in accordance with the terms of the purchase orders.  Company B made a partial payment in April 2013 and Axesstel subsequently took back the remaining product that Company B could not sell. Axesstel was unable to sell the product at the same unit price and recorded a loss on the sale.

**Incomplete Sales to Company C**

33.     On or about December 19, 2012, Axesstel customer Company C, a telecommunications distributor in Nigeria, purportedly ordered 5,000 Axesstel AG50 security alert systems and 5,000 Axesstel SP100 smart phones, with total projected revenue for Axesstel of $1.4 million.  These sales were memorialized in a "holding PO" dated December 19, 2012, which lacked basic terms (such as the shipping instructions), contained incorrect pricing terms, and indicated that Company C would pay in U.S. dollars pursuant to a letter of credit that had not yet been obtained.

34.     In late December 2012, Axesstel's sales personnel informed Sabin that Company C's letter of credit was unlikely to come through before the end of 2012.  Sabin informed them that he would find "somewhere to store the product until the [letter of credit] comes through," noting that "we can't have the product in our warehouse for the year-end audit."

35.     As anticipated, Axesstel did not receive a letter of credit or a purchase order with corrected terms from Company C by the end of 2012, and as a result Sabin did not ship the product to Company C before the end of 2012.  Instead, Axesstel held the product in a warehouse under Axesstel's own control and Axesstel sales personnel informed Sabin that the product would not be shipped to Company C until they gave the "green light."

36.     As late as January 17, 2013, in an email on which Gray was copied, Sabin instructed Axesstel's sales personnel to obtain revised purchase orders from Company C,

explaining, "[w]e have enough issues with the Q4 M[iddle] E[ast] A[frica] revenue without having to try to explain why our invoices don't match the PO price (overstated by $500k) and the PO's are contingent and the contingencies have NOT been removed." Sabin also communicated that Axesstel's auditor had sampled the warehouse and asked for shipping documentation for the Company C order, and Axesstel had been unable to produce shipping documents and produced only cargo receipts.  In response, Axesstel's sales personnel expressed to Sabin the view that they wished they could "run the business under normal terms" instead of being "pushed to hit imaginary numbers."

37.    Axesstel's records included a later invoice, dated January 29, 2013, that specified Company C was responsible for prepayment of the full purchase price but, as of that date, Company C had not made any payment on the purported sale.

38.    In fact, Axesstel sales personnel had entered into a side agreement, which they formally confirmed to Company C by email in February 2013, providing that "Company C is not responsible for the balance of $1,435,000 due at 31 Dec 2012, until Company C has actually received the goods."

39.    Axesstel, through the efforts of Gray, Hickock, and Sabin, improperly recognized $1.4 million from this purported fourth quarter sale to Company C and included this revenue in the financial results that it reported in its 2012 Form 10-K. Because the product had not been shipped to Company C by the end of the fourth quarter, when revenue on the sale was recognized by Axesstel, Company C had no obligation to make payment at the time revenue was recognized.  Moreover, Axesstel had not received

12

a letter of credit by year-end and therefore collectability was not reasonably assured.  As such, revenue from these purported sales was neither realized nor realizable, nor earned, as required by GAAP and should not have been recognized in the fourth quarter of 2012.

40.     As it turned out, Company C never paid for the product it had purportedly purchased in December 2014.  On February 15, 2013, Axesstel's sales personnel informed Sabin that payment was unlikely before the last week of February.  In late February, Company C complained of a technical issue with samples of the SP100 smart phones that they had received in December, and refused to accept shipment.  In November 2013, Axesstel recorded all $1,435,000 million of Customer C's purported purchase as returned to inventory.

41.     In total, as a result of Gray's, Hickock's, and Sabin's knowing or reckless misconduct related to the purported sales to Company A, Company B, and Company C, Axesstel improperly recognized $10.5 million in revenue in the fourth quarter of 2012, amounting to 66% of the Company's total reported revenue for the quarter and more than 17% of total reported revenue for fiscal year 2012.

42.     On or about February 25, 2013, Gray and Hickock knowingly or recklessly signed a letter to Axesstel's auditor certifying, among other things, that (i) the Company's financial statements for the year ending December 31, 2012 had been prepared in accordance with GAAP and properly recorded all material transactions; (ii) they had reviewed the criteria for revenue recognition and were recognizing revenue in accordance therewith; (iii) they had fully disclosed all sales terms including all

customer acceptance provisions and rights of return; and (iv) there were no significant deficiencies in Axesstel's internal control over financial reporting.

43.     Revenue from these fourth quarter 2012 transactions was included in Axesstel's financial statements for the quarter and reported in its 2012 annual report for the period ended December 31, 2012.  Gray and Hickock signed and certified the 2012 annual report on Form 10-K that Axesstel filed with the SEC on February 28, 2013, knowingly or recklessly disregarding the fact that it contained false and misleading financial statements.

## Axesstel Reported Material Amounts of Improper Revenue in the First Quarter of 2013

44.     In early March 2013, prior to the end of the first quarter, Gray and Axesstel's sales personnel discussed how Axesstel's financial results for the quarter were shaping up and, specifically, whether Axesstel would break even or report a loss.   Gray suggested that the sales personnel make a last attempt to close orders in Africa, which would enable Axesstel to avoid reporting a loss, which was also consistent with Hickock's desire to avoid dropping into a loss for the quarter.

45.     On or about March 27, 2013, Sabin and Axesstel's sales personnel sent Gray purchase orders that purported to reflect an order of 25,000 units of Axesstel's AG50 security alert system by Company D, a Zimbabwean telecommunications company, and an order of 14,500 units of Axesstel's AX52R security alert system by Company E, a

South African telecommunications company, with total projected revenue of $3.9 million.

46.     In fact, neither Company D nor Company E had committed to purchase specific quantities of Axesstel alert systems by the end of the first quarter of 2013. Instead, Axesstel's sales personnel fabricated "holding POs" for the purported sales.

47.     In discussions and communications with Sabin in late March 2013, Axesstel's sales personnel referred to the Company D and Company E purchase orders as "holding POs" that would be replaced with "real" purchase orders sometime in April 2013 (after the end of the first quarter of 2013), and forwarded Microsoft Word versions of the POs to Sabin in case changes needed to made.  Sabin provided these "holding POs" to Gray for revenue recognition on the sales.

48.     No later than March 30, 2013, Gray and Hickock were explicitly informed by Axesstel sales personnel that the purchase orders upon which Axesstel booked first quarter revenues were "holding POs" and that "real POs" were not expected until mid-to-late April, when Company D and Company E expected to have letters of credit in place. Gray and Hickock were also told that Company D and Company E both would ultimately take fewer units than was reflected in the "holding POs."

49.     Gray and Hickock also were aware that Axesstel's sales personnel had adjusted upwards by at least $10 per unit the price on the products reflected in the Company D and Company E purchase orders.  Gray and Hickock had authorized this price increase in part to enable Axesstel to hit revenue targets for the quarter.

50.    With negotiations over price, quantity, and payment terms ongoing well into the second quarter, Axesstel did not ship the products to Company D and Company E by the end of the first quarter of 2013 and Gray, Hickock, and Sabin all knew that these shipments did not take place.

51.    In total, as a result of Gray's, Hickock's, and Sabin's knowing or reckless misconduct related to the purported sales to Company D and Company E, Axesstel improperly recognized $3.9 million in revenue in the first quarter of 2013, amounting to 38% of the Company's total reported revenue for the period.  Because Axesstel lacked persuasive evidence of an arrangement, delivery did not occur before the end of the quarter, and Axesstel's price to Company D and Company E was neither fixed nor determinable, revenue from the purported sales to Company D and Company E was neither realized nor realizable, nor earned, as required by GAAP and should not have been recognized in the first quarter of 2013.

52.    Gray, Hickock, and Sabin knew or were reckless in not knowing that (i) the purchase orders for the first quarter 2013 sales to Company D and Company E were "holding purchase orders" that did not reflect final agreements with the customers; (ii) the actual price to be paid by the customers and the payment terms had yet to be determined or agreed by quarter-end; and (iii) neither Company D nor Company E had committed to purchasing a specified quantity of product by quarter-end.

53.    On April 30, 2013, before Axesstel filed is first quarter Form 10-Q, Hickock informed Gray, Sabin, and Axesstel's sales personnel that he was not in favor of using

"holding POs" on a going-forward basis because it accelerates revenues and creates problems for future quarters.  He allowed the use of "holding POs" for the first quarter but informed them via email that "[o]nce we dig out of this hole I want to sell to real demand only."

54.    On or about May 8, 2013, Gray and Hickock signed a letter to Axesstel's auditor certifying, among other things, that (i) the Company's financial statements for the first quarter of 2013 had been prepared in accordance with GAAP and properly recorded all material transactions; (ii) they had reviewed the criteria for revenue recognition and were recognizing revenue in accordance therewith; (iii) they had fully disclosed all sales terms including all customer acceptance provisions and rights of return; and (iv) there were no significant deficiencies in Axesstel's internal control over financial reporting.  Gray and Hickock knew or were reckless in not knowing that these representations were false at the time they were made.

55.    Revenue from the purported sales to Company D and Company E was included in the Company's financial statements contained in its periodic report on Form 10-Q for the period ended March 31, 2013.  Gray and Hickock signed and certified this periodic report that was filed with the SEC on May 14, 2013, knowingly or recklessly disregarding the fact that it contained false and misleading financial statements.

56.    Ultimately, neither Company D nor Company E ever paid for the products they purportedly purchased in the first quarter of 2013.  In November 2013, Axesstel

recorded all $3.9 million from Customer D's and Customer E's purported first quarter 2013 purchases as returned to inventory.

### Gray, Hickock and Sabin Misled Axesstel's Audit Committee and Auditor

57.     In Fall 2013, an Axesstel sales executive in Europe reported to Axesstel's Board of Directors that Axesstel had improperly recognized revenue from incomplete sales to multiple customers in the fourth quarter of 2012 and the first quarter of 2013.

58.     The Axesstel sales executive alleged that, in connection with these illegitimate sales, Axesstel had (i) afforded flexible payment terms to customers; (ii) granted customers rights of return if the customers couldn't resell the goods; and (iii) not fully transferred control of product to the customer by the close of the periods in which revenue was recognized and reported.

59.     Axesstel's Board of Directors tasked the Chairman of the Audit Committee with investigating these allegations and reporting his findings to the Board of Directors for appropriate action.

60.     In connection with his investigation, the Audit Committee Chair interviewed Gray, Hickock, and Sabin and asked them each to provide all available documentation concerning material sales to Axesstel customers in the fourth quarter of 2012 and first quarter of 2013.

61.     In response, Gray, Hickock, and Sabin represented to the Audit Committee Chair that they had no relevant documentation to provide, thereby deliberately concealing their fraudulent conduct from Axesstel's Audit Committee.  They also told the Audit

Committee Chair that the purchase orders accurately reflected Axesstel's agreements with customers, there were no open terms at the time revenue was recognized and the customers did not have a right to return the products.

62.   At the conclusion of his investigation, Axesstel's Audit Committee Chair informed Axesstel's Board of Directors and the company's auditor that the European sales employee's accusations of accounting improprieties appeared to be unfounded.

63.   In the first quarter of 2014, Axesstel's auditor questioned the fact that Axesstel had not yet received payment for the first quarter 2013 sales to Company D and Company E.  The auditor asked Gray for documentation supporting revenue recognition for these sales.  Axesstel's Audit Committee Chair also asked to see the purchase orders and the sales documentation.

64.   Gray provided the requested documentation and purported to conduct a further investigation into the first quarter 2013 revenues recognized from sales to Company D and Company E.

65.   Ultimately, Gray reported that the Company D and Company E purchase orders had been fabricated by Axesstel sales personnel, thereby further concealing his, Hickock's and Sabin's involvement in the accounting malfeasance that transpired in the first quarter of 2013.  Gray continued to conceal pertinent details about the Company's recognition of revenues from sales to Companies A, B, and C in fourth quarter 2012.

66.   At the request of Axesstel's auditor, Gray drafted a memorandum purporting to explain the details of the first quarter 2013 sales to Companies D and E, and the

circumstances surrounding the fabrication of purchase orders by Axesstel sales personnel. He falsely stated that management had been unaware of Axesstel's practice of obtaining or fabricating "holding purchase orders" before key terms of sales had been finalized.

67.    Gray also drafted a memorandum to Axesstel's auditor purporting to explain the details of the fourth quarter 2012 transactions with Company A, Company B, and Company C.  His memorandum failed to accurately disclose the true nature and circumstances surrounding those transactions, and falsely asserted that Axesstel had properly recognized revenue from these transactions in the fourth quarter of 2012.

68.    On March 31, 2014, Axesstel announced in a report on Form 8-K filed with the SEC, that it intended to restate its unaudited financial statements for the first, second, and third quarters of 2013 due to "errors relate[d] to the recognition of revenue from sales to two customers in the first quarter of 2013."  Gray signed the report on Form 8-K knowingly or recklessly disregarding the fact that it contained false, misleading, or incomplete statements including, that the restatement was the result of "errors" and not fraud.  The report also omitted to disclose that Axesstel's senior management had been involved in the fraud and that Axesstel had additionally improperly recognized and reported revenue in 2012.

69.    To date, Axesstel has not filed restated financial statements.  It has not filed audited financial statements or required quarterly or annual reports since November 14, 2013, when it filed its third quarter 2013 Form 10-Q.  On October 6, 2017, Axesstel's registration was revoked for failure to comply with reporting requirements.

70.     Prior to Axesstel's deregistration, neither Gray, Hickock, nor Sabin took any steps to correct Axesstel's false and misleading periodic quarterly and annual filings.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
### (Against Defendants Axesstel, Gray, and Hickock)

71.     Paragraphs 1 through 70 are hereby realleged and incorporated by reference as if set forth fully herein.

72.     As alleged more fully above, Defendants Axesstel, Gray, and Hickock, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of securities made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     By reason of the foregoing, Defendants Axesstel, Gray, and Hickock violated, and unless restrained, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
### (Against Sabin)

74.     Paragraphs 1 through 73 are hereby realleged and incorporated by reference as if set forth fully herein.

75.     As alleged more fully above, Defendant Sabin knowingly provided substantial assistance to Axesstel in its commission of violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], including, by working with Axesstel sales personnel to obtain "holding POs" and to alter purchase orders to justify revenue recognition.

76.     By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. 78t(e)], Defendant Sabin, directly or indirectly, has  aided and abetted and, unless restrained, will continue to aid and abet violations of  Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

**THIRD CLAIM FOR RELIEF**
**Violations of Section 13(b)(5) of the Exchange Act**
**and Rule 13b2-1 Thereunder**
**(Against Defendants Gray and Sabin)**

77.     Paragraphs 1 through 70 are hereby realleged and incorporated by reference as if set forth fully herein.

78.     As alleged more fully above, Defendants Gray and Sabin knowingly circumvented or knowingly failed to implement a system of internal accounting controls at Axesstel, and directly or indirectly, knowingly falsified, or caused, through the conduct described above, to be falsified Axesstel's books, records, or accounts.

79.    By reason of the foregoing, Defendants Gray and Sabin violated and, unless restrained, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

### FOURTH CLAIM FOR RELIEF
**Violations of Section 13(a) of the Exchange Act**
**and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder**
**(Against Defendant Axesstel)**

80.    Paragraphs 1 through 70 are hereby realleged and incorporated by reference as if set forth fully herein.

81.    The Exchange Act and Exchange Act Rules promulgated thereunder require issuers of securities registered pursuant to Section 12 of the Exchange Act to file quarterly reports on Form 10-Q, annual reports on Form 10-K, and current reports on Form 8-K, containing information prescribed by the SEC's rules and regulations, including all such further material information as may be necessary to make the statements contained therein, in light of the circumstances under which they are made, not misleading.  Financial statements included in quarterly reports on Form 10-Q and annual reports on Form 10-K must be prepared in conformity with GAAP.

82.    As alleged more fully above, Defendant Axesstel failed to file with the SEC accurate and complete information, reports, and documents, including an annual report on Form 10-K for the period ended December 31, 2012, a quarterly report on Form 10-Q for the quarter ended March 31, 2013, and a current report on Form 8-K filed on

March 31, 2014, and such further material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

83.     By reason of the foregoing, Defendant Axesstel violated, and unless restrained, will continue to violate Section 13(a) of the Exchange Act  [15 U.S.C. § 78m(a)] and Rules 12b-20,13a-l, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 13(a) of the Exchange Act
and Rules 12b-20, 13a-1, 13a-13 Thereunder
(Against Defendants Gray, Hickock, and Sabin)**

84.     Paragraphs 1 through 70, 80 through 83 are hereby realleged and incorporated by reference as if set forth fully herein.

85.     As alleged more fully above, Defendants Gray, Hickock, and Sabin knowingly providing substantial assistance to Axesstel in its failure to file with the SEC accurate and complete information, reports, and documents, including an annual report on Form 10-K for the period ended December 31, 2012 and a quarterly report on Form 10-Q for the quarter ended March 31, 2013, and such further material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

86.     By reason of the foregoing,  pursuant to Section 20(e) of the Exchange Act [15 U.S.C. 78t(e)], Defendants Gray, Hickock, and Sabin have aided and abetted and,  unless restrained, will continue to aid and abet violations of  Section 13(a) of the

24

Exchange Act  [15 U.S.C. § 78m(a)] and Rules 12b-20,13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Rule 13a-11
### (Against Defendant Gray)

87.    Paragraphs 1 through 70 are hereby realleged and incorporated by reference as if set forth fully herein.

88.    As alleged more fully above, Defendant Gray knowingly provided substantial assistance to Axesstel in its failure to file with the SEC accurate and complete information in a current report on Form 8-K filed on March 31, 2014.

89.    By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. 78t(e)], Defendant Gray has aided and abetted and, unless restrained, will continue to aid and abet violations of Rule 13a-11 under the Exchange Act [17 C.F.R. § 240.13a-11].

## SEVENTH CLAIM FOR RELIEF
### Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act
### (Against Axesstel)

90.    Paragraphs 1 through 70 are hereby realleged and incorporated by reference as if set forth fully herein.

91.    As alleged more fully above, Defendant Axesstel failed to make or keep books, records, or accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.  Axesstel also failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that

transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets for the periods ended December 31, 2012 and March 31, 2013.

92.     By reason of the foregoing, Defendant Axesstel violated, and unless restrained, will continue to violate Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

### EIGHTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Sections 13(b)(2)(A)
and 13(b)(2)(B) of the Exchange Act
(Against Defendants Gray and Hickock)**

93.     Paragraphs 1 through 70 are hereby realleged and incorporated by reference as if set forth fully herein.

94.     As alleged more fully above, through their conduct, Defendant Gray knowingly or recklessly provided substantial assistance to Axesstel in its failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.  In addition, by failing to ensure that such internal accounting controls existed, Defendants Gray and Hickock, as CFO and CEO, respectively, knowingly provided substantial assistance to Axesstel in its failure to devise and maintain internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain accountability for assets.

95.     As a result of the foregoing, pursuant to Section 20(e) of the Exchange Act

26

[15 U.S.C. 78t(e)], Defendants Gray and Hickock aided and abetted, and unless restrained, will continue to aid and abet, violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

### NINTH CLAIM FOR RELIEF
**Violations of Exchange Act Rule 13b2-2**
**(Against Defendants Gray and Hickock)**

96.     Paragraphs 1 through 70 are hereby realleged and incorporated by reference as if set forth fully herein.

97.     As alleged more fully above, Defendants Gray and Hickock, who were officers of Axesstel, directly or indirectly, made or caused to be made materially false or misleading statements or omitted to state or caused another to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with an audit or examination of the financial statements of Axesstel, including signing letters to Axesstel's auditor falsely certifying, among other things, that (i) Axesstel's financial statements for the periods ended December 31, 2012 and March 31, 2013, had been prepared in accordance with GAAP and properly recorded all material transactions; (ii) they had reviewed the criteria for revenue recognition and were recognizing revenue in accordance therewith; (iii) they had fully disclosed all sales terms including all customer acceptance provisions and rights of return; and (iv) there were no significant deficiencies in Axesstel's internal control over financial reporting.

98.     As a result of the foregoing, Defendants Gray and Hickock, violated and,

unless retrained,  will continue to violate Exchange Act Rule 13b2-2 [17 C.F.R.

§ 240.13b2-2].

**TENTH CLAIM FOR RELIEF**
**Violations of Exchange Act Rule 13a-14**
**(Against Defendants Gray and Hickock)**

99.     Paragraphs 1 through 70 are hereby realleged and incorporated by

reference as if set forth fully herein.

100.   As alleged more fully above, Defendants Gray and Hickock each falsely

certified, pursuant to Section 301 of the Sarbanes-Oxley Act of 2002 and Exchange Act

Rule 13a-14, Axesstel's quarterly report on Form 10-Q for the period ended March 31,

2013 and annual report on Form 10-K for the period ended December 31, 2012.  Each

stated that he had reviewed each such report and that based upon his knowledge, the

reports did not contain any untrue statements of material fact or omit to state a material

fact necessary to make the statements made, in light of the circumstances under which

such statements were made, not misleading.  Gray and Hickock also each certified that,

based upon his knowledge, the financial statements and information contained in the

reports fairly presented, in all material respects, Axesstel's financial condition, results of

operations, and cash flows.

101.   Defendants Gray and Hickock knew that the reports they certified contained

untrue statements of material fact and omitted to state material facts necessary to make

the statements therein, in light of the circumstances under which the statements were

made, not misleading.

102.   As a result of the foregoing, Defendants Gray and Hickock violated and, unless restrained, will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court enter final judgments:

A.   Permanently restraining and enjoining Defendant Gray from violating Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.13b2-2] and from aiding and abetting violations of Sections 13(a), 13(B)(2)(A) and 13(B)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(B)(2)(A), and 78m(B)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [ 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13-13];

B.   Permanently restraining and enjoining Defendant Hickock from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5, 13a-14, and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, and 240.13b2-2], and from aiding and abetting violations of Sections 13(a) and 13(B)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(B)(2)(A)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13-13];

C.   Permanently restraining and enjoining Defendant Sabin from violating Section 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §§ 240.13b2-1], and from aiding and abetting violations of

Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder [ 17 C.F.R. §§ 240.12b-20, 240.13a–1, and 240.13-13];

D.    Prohibiting pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] each of Defendants Hickock and Gray from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o];

E.    Ordering pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], each of Defendants Gray, Hickock, and Sabin to pay a civil money penalty; and

F.    Granting such other further relief as this Court may deem just and appropriate.

Dated:  June 28, 2018                          Respectfully submitted,

                                               U.S. SECURITIES and EXCHANGE
                                               COMMISSION

                                               __/s/Suzanne J. Romajas_____
                                               SUZANNE J. ROMAJAS
                                               CHRISTIAN D. H. SCHULTZ
                                               Securities and Exchange Commission
Of Counsel:                                    100 F Street, NE
Amy L. Friedman                                Washington, DC  20549-5971
Adam B. Gottlieb                               Tel: 202-551-4473 (Romajas)
                                               Email:   RomajasS@sec.gov

                                               *Counsel for Plaintiff*